You may proceed. May it please the court. Martha Duban was injured when she was walking in the alleyway in the Waverly Sales Barn that led between the stable area where the horses were kept and the arena floor during a draft horse sale. The trial court erred in interpreting Iowa Code Chapter 673 in a manner that the legislative intent of that statute and with the Iowa Supreme Court's prior interpretations of the statute. The statute is clearly ambiguous. It defines two categories of injured people in the definitions under Iowa Code Chapter 673.1. The first is spectators who are defined as people who are in the vicinity but are not participants. The second is participants who are defined as people who are engaged in the activity. Now when we talk about participants are we talking about the people are making the bids down there? Are we talking about spouses of people that came along to see a wonderful auction? What's the makeup of that whole scenario at a horse sale? The statute does not make that clear and that's one of the ambiguities that I would argue in the statute. It talks about people who are engaged in the in the activity but the activity is defined as or engagement in the activity is defined as participating in an event that was carried on by a horse sale sponsor or in an activity that was carried on by a horse sale sponsor. My argument would be that clearly... That is a very good question. The statute refers to from the perspective of the sponsor. It says whether the area was intended or designated as an area for non-participants. So at one point I think I said in my in my briefs to the lower court that really Waverly Sales intends for the people in the building to be participants in the auction. This is not a show like a rodeo. This is a horse sale. The business of the Waverly Sales company is to make money commissions from the sales of livestock. The people who come to the sale are expected to be people who are there to bid. Now when you talk about every bleeding or every beating heart in the in the building I don't think that's necessarily the case because it was clear that there were areas in the sale barn. For example there's cafeteria, there's a lobby area. There may be some people in the building who are not necessarily engaged but certainly the people who are in the arena area from Waverly Sales perspective should be people who are there either as sellers of animals, as or as there was much testimony including the testimony of one of these people that there are some teenagers who participate in the sale by helping lead the horses. Perry Helmuth testified it at the district court level. All of these people are actually engaged and participating in the horse sale. There was also testimony to the effect that occasionally spectators will come. Ron Dean testified that he was contacted at one point several years ago by a school class that the teacher wanted to take her class and he said yes you may come you should enter through the front doors and if you enter through the front doors like a member of the public who is not participating in the sale would you would enter through the front doors and the signage in the lobby would lead you to the south bleacher area. The area where you do not have to go across any part of the floor or encounter any horses to go from the lobby where the cafeteria is and where the restrooms are and where the entrance door is into the arena itself. The people who are on the floor at the horse sale are expected to be people who are there to either sell or to bid or to show the horses. The statute is clearly ambiguous not only in that first it defines spectators then it defines participants but in the fourth exception which is the exception that the plaintiff is relying upon here it doesn't refer to spectators or who are not participating. At this point I'm going to point out that I noticed this weekend for the first time when I was preparing for trial that if you look at my brief the first time I cite the exception in my brief the site is incorrect because it looks at the fifth exception not the fourth so I would ask you to refer to the statute itself that is in the appendix at page of addendum 34 number 4 shows where the the actual provision that they are relying upon is that is a domesticated animal activity which occurs in a place designated or intended by an animal activity sponsor as a place for persons who are not participants to be present. Because there are ambiguities in this statute the the court in looking at it must look to the legislative intent. The legislative intent is clear from the face of the statute itself it is clearly to shield those who sponsor domesticated animal activities from liability to people who by participating in or being in the vicinity of an animal activity assume the risk of the dangers of dealing with these animals. The statute itself sets out that the sponsors are not liable either to spectators or to participants. That's a broad statement. Furthermore the Iowa Supreme Court has stated in Haynes v. Clay County Fair which is cited in my brief that the intention of this statute is a broad blanket immunity for sponsors and participants in these activities. The idea is clearly to provide a way for these people people like my clients to hold these sales without being held liable for the things that they can't control. The dangers that are inherent in dealing with these types of animals and those dangers are set out in the statute. The statute that the exception that we're relying upon here exception number four specifically refers to the intention or designation of an activity sponsor as to whether the area is for participants or non-participants. Mrs. Dubin would like you to believe that her own private intention is what governs here. They have admitted that Tom Dubin, her husband, who came to the sale with her, purchased seats in the area which the sale barn had set out was for bidders, sat down there with her. They have admitted that he is a participant in the bid. She did not intend to help her husband. She probably intended to approve such as by winking or saying no no no don't go there. Possibility there's a little more involvement by her in this endeavor? Well I'm a married person and I can't imagine my husband making a major purchase without me having some input into it if I'm standing right there. The only knowledge we have for sure about Martha Dubin's the only evidence we have about her intentions are her stated intentions but the problem with that is if we rely upon the stated intention of the the plaintiff then we are looking at a situation where the sale barn has no way to know who they need to protect or who they are protected from liability against. How about starting with everybody? Unfortunately the evidence was pretty clear in this case that that's not really possible at a sale like this where you're dealing these draft horses weigh over a thousand pounds and you're dealing with the there are as the statute points out inherent risks in dealing with animals like this. These people who are at the sale all of the evidence in the case showed they're what we referred to in the trial as horse people. They're used to walking right up to a horse they don't think anything about it. The people who are standing down in that Northeast alleyway as was Martha Dubin herself who was raised with horses and who had lived on farms having draft horses her entire life. These were people who were accustomed to horses. The bidders would go into the stalls with the horses and look at the horses that they chose to bid on. These are not people who are concerned about being kept away from the dangers of these horses. As you would see perhaps in a rodeo or something like that where you have people who are clearly just there to watch and don't have anything to do with the animals personally themselves. Let's see, the point at which she was injured by this horse was where? The horse obviously did not escape through the guardrails or anything like that. No, actually the only... She had walked back to find a restroom. She had crawled through some barriers or something to get out to where she was going? Right, she was in the North bleachers. She crawled under the bars that protect the people in the North bleachers from the animals in the arena. She crawled under those bars. She walked across the arena floor itself during the horse sale into the alleyway where the horses are led after they're sold and then walked through the stable area. Now interestingly the district court held in the ruling on the temporary judgment that had she been in the stable area that was clearly an area that was not designated for non-participants. Now how the stable area can be an area not designated for non-participants but the alleyway between the stable and the arena floor itself is an area designated for non-participants is difficult for me to understand. Unless there are other questions at this point in time. Very well. Thank you. Good morning. You're Mr. Reed? Yes. You may proceed. Good morning, Your Honors. May it please the court, counsel. A participant is defined in the statute 673.2 as somebody who engages in the domesticated animal activity. In this case the activity turns out to be important. It was a commercial one. It was a business one. Bidding on or selling horses or equipment related to that. The only activity that the evidence showed that Mrs. Dubon was involved in was a social one. And the focus of the district court was not to, was to look at the actions of testimony. She gave no deposition testimony by virtue of significant hearing issues and age-related dementia. She was just simply unable. So the court didn't look at intentions. The court looked at what the evidence was in terms of her actual actions. This is a very important exception to the immunity statute. And it's important I think because, well first of all, it makes sense. It places an element of responsibility on the, for safety of non-participants, on the person who the legislature evidently felt was the person that had the best opportunity to provide that safety. It was the people who were sponsors of this event, who decided how the auction was going to operate, who decided how the to locate the bathrooms and where to locate the vending areas, and decided the flow of traffic. In other words, the non-participants in this particular case under this exception to immunity were provided with a legal recourse for injury when the owner placed them at some risk, since the owner was in the best position of all to be able to. How does the owner protect against someone like Mrs. Durbin who crawls under a safety railing, walks across the sail rig, and then into some other area? Yeah, great point. This, imagine this arena area and on either side are bleacher seats. The north side is where the Dubons were sitting, the south side, and then of course there's some additional seating. You've got a choice as an 82 year old woman or a 22 year old woman. It doesn't make any difference. If you're in those north bleachers, if you, and particularly if you're in the center of the bleachers, you've got to get out of that bleacher area. And you imagine the compact number of people that are confined in these areas. You've either got to try to make your way through these little individual seats, they're not individual seats, they're just long slatted seats. You've got to either make your way through these people, or you make your way out onto the arena floor, follow it through, and then go into the East Alleyway. Now the injury did not happen on the arena floor, and I'll talk about, if you'd like, why that's significant. And it's possible that had Mrs. Dubon been injured on the arena, that may have been a place, and it probably was a place, where the sponsors of this activity didn't intend for people like Mrs. Dubon non-participants to be. However, when you're allowed to sit in this north bleacher area, which she clearly was, you've got to get into it, the seat, and you've got to get out of it. And so it's kind of a red herring to talk about, she crawled through the... But, well, was, was there, was she required to get to this bathroom, restroom area, to go to the place where she was injured? There were three exits, or ingress, egresses, into this bleacher area. One was the Northeast Alleyway, which is where this injury took place. The second one was the West, Northwest Alleyway, which is the area where the horses come into the arena, and you've got a long line of horses, all of whom are unfamiliar with one another. Husbands thought that was a dangerous sort of a place to go. Or, you could walk directly across the arena to the south side, and make your way that way. There were only three ways to do that. In other words, there was no safe way to get to the restroom? Well, that's certainly a fact question. There was no way to get to the restrooms from this north bleacher area that would not put you in contact with this domesticated animal activity. That is, in this case, either the animals coming in from the West, or the animals leaving the arena from the East. That's many cattle sales, but could she not have gone out the way she had come in with her husband, and then made it an entrance to the restroom area? She came in to this north seating area through the very same way that she had exited. When she was actually injured, she actually safely made it through the East Alleyway. She went to the bathroom, she came back, and it was at the time that she came back, unbeknownst to her, two 2,000-pound draft horses had just been sold. The negligence picture picks up from there. The sponsor of the activity had called to have this big overhead door opened, unbeknownst to the person holding and caring for the horses. It spooked and shied them. In this East Alleyway, though, the sponsors say it's supposed to be clear of traffic. It's full of people. Like turning the lights on and seeing the cockroaches scatter, boom, these people just went everywhere when these animals started getting crazy, and that is when Mrs. Dubin was knocked over and trampled by these horses. So would it be fair to say, I'm trying to get a grasp as to exactly what she did, was this just a shortcut that she elected to take to go across the arena rather than going around the arena floor, so to speak? Yeah, let me be as clear as I can about the arena. You've got the bleachers, you've got the bleachers, and a bunch of people are sitting there. You either can make your way through... You'd better stay next to the microphone. I'm sorry. You can either make your way through, and these are long, I couldn't tell you, you know, 50 yards long, whatever they are. You can either make your way through the people, or you can do what most everybody else did, who were sitting in the middle of these bleachers, and just crawl through the... there's like three railed... and closely walk down. And then, and you can go east, or you can go west. She went east because her husband indicated that was the safest way to go, since if she went west, she'd have to cross where all these horses are lining up and coming in. And so she went east, safely made it out, went around, took the only way she could go, around the back of the bleachers. There's a big wall that separates, but around the back. I assume there's a picture. I didn't bring my appendix with me. Is there a know that there are any included in the appendix? Are there any in existence? Oh yeah, sure. Yeah, we had a number in the, in the, in the actual trial, just to explain this. So, so to be clear... In this record, we do have pictures that we can look at to get a better concept of the layout of this facility. I don't think we submitted any pictures in our, in our appendix. So I, so that's obviously concerned. So I want to be really clear on how this is set up. What about plaintiff's exhibit 21? Did we have some in there? Okay. I'm looking at, and then exhibit 20, 20 is a, is a drawing. It's 21. Okay, sure. And then, and then 20 is somebody's drawing. Okay, sure. Yeah, perfect. Exhibit 21 is a picture that's looking towards the north bleachers. And so Mrs. Dubon would have been in the center of that. And as you're looking at the picture, if you look to the right, that's the east. And so being in the center of those bleachers, she had three options. She could either go east, west, or straight across the arena floor to get, to make herself, make her way to the bathrooms, which were on the south part of the arena, the opposite. How did she get into the bleachers? Did she have to come across the arena floor? Had she come from the south, yes, but I believe the testimony was. In other words, you can't come from the outside, as it were. You can come from, there's a hallway behind those north bleachers. Right. She may have come from that direction. She may have come from the south. There's uncertainty about that. Well, let me ask you this. If it were, if it turns out that it's significant or perhaps determinative whether, as a legal matter, the plaintiff here was a spectator or a participant, what's in the record? And I'm not talking about someone's speculation or trying to read her mind. What's in the record that guides us to make that legal call? Well, first of all, it's important to note that that matter was decided as a matter of law by agreement of the parties on motion for summary judgment. We submitted a statement on stipulated facts as to that issue. We decided that, and we told the court, you've got these stipulated facts and you can apply these facts to this statute. We want you to do so. And so that's what they did and what the court found was that Mrs. Dubon didn't have a bid card. She didn't use her husband's bid card. She didn't bid on, there's no evidence that she bid on anything. The fact is, there was no evidence that she'd ever purchased anything at any of the other occasions or on this occasion in which she attended. There was no evidence that she, and there's a case. Okay, well, I understand what the court's reasoning, but what I'm asking is, what's in the record that the district court looked at, and that we should look at, to arrive at some conclusion? And you're saying there is a document, a stipulation of facts document, correct? Yes, yeah, there is a stipulation. Is there anything else? I noticed the statement was made that this plaintiff was not deposed. That's right. Did she submit an affidavit? Did she answer interrogatory? She had the first motion for summary judgment. The second motion for summary judgment was strictly on the stipulated facts. Of course, her husband, Tom, testified. By the time we got to trial, this case had been submitted on stipulated facts, and the court decided on the motion for summary judgment that the statute giving immunity did not apply. So in that event, this case went to trial on negligence and on the immunity portions of the statute. The court, having decided the issue as a matter of law, we then proceeded to try the case. It was tried on negligence and comparative fault. It was instructed on negligence and comparative fault. The jury was not asked to make any factual findings relative to the immunity provisions, that is, whether or not Mrs. Dubin was a spectator, a the injury took place at the point of a domesticated animal activity location where the sponsors knew or should have expected that a non-participant would be. The jury wasn't asked to make any of those findings. The appellants didn't ask for any instructions relative to any of those findings. It was all decided as a matter of law. So we then tried it on strict negligence and comparative fault. That was in part why it's our position that to use the trial transcript in order an attempt to sort of bolster these immunity arguments isn't appropriate. You know, there are a lot of people, just like Mrs. Dubin, who go to events, and this is really a spectacle, like this. As a matter of fact, the owner even testified that, yeah, I know there are people that sit in those areas. Sometimes they're old retired farmers that are just interested in horses, but I know they're not. Something to do in the wintertime, I've found. This happens twice a year, in the spring and in the fall. Spring and in the fall. An analogy event, I think, many of us have seen on television, the Barrett-Jackson auto auctions. I don't know if you ever had, but they're often in very nice places with beautiful old automobiles that go through the ring. And while the event caters to buyers and sellers and so on, there's a lot of people who are just drawn by the spectacle, by the event itself, many of whom couldn't afford one of those fancy cars or one of these fancy horses to begin with. To hit the point of Martha's... So your point is that this business about whether she was a spectator or a participant was decided on summary judgment. That's exactly right. And it's not a situation where, for example, summary judgment is denied and then the issues eventually presented to a jury. That's exactly right. These issues were not presented to this jury. And it's absolutely clear because just look at the verdict form. The jury was not asked to make any decision with respect to these two facts. We had submitted that strictly by stipulated facts and submitted that to the judge, and the judge made that determined as a matter of law. And this case went on to be tried as a simple negligence in comparison. Does a plaintiff in the judgment decision, as we have here, does that plaintiff have to do anything in particular to preserve the issue? Did the Dubons, as plaintiffs, have to preserve the issue of... Yeah. Is there something in particular that a plaintiff in that position must do in view of the fact that a trial follows to preserve that summary judgment issue? Or is it waived? I'm not aware of anything that I needed to do or could have done to preserve that. I'm talking about the appellant. Oh, the appellant. Or can we consider? I guess the question is, can we consider on appeal that summary judgment order? Is that properly before the court? Yeah, and that's what's being appealed. Really, that's what's being appealed today. And the appellants are suggesting that the court simply applied the facts wrongly to what the law was. It is in this case. Does that fully answer your question or just add confusion? I see your time is up. Thank you for your argument. Thank you. First, as to conversation or discussion about how the sale barn itself was laid out, in the brief to this court, Dubons did argue that the setup of the horse barn should have been... It should have been set up. The fact of the matter is, that matter was argued before the trial court. The plaintiff had brought an allegation that the setup of the sale barn was negligent. The trial court had ruled that the plaintiff adduced no evidence on that issue. They didn't bring in any experts as to standards of care, how it should be set up, how it could have been set up, what the cost would have been. Therefore, the court excluded all evidence regarding how the arena was set up. And the plaintiff did not appeal that ruling. So that ruling has already been decided by the trial court and is not on appeal. We've had some discussion regarding the North versus the South bleachers. It's my position that the South bleachers, where a member of the public who was themselves, they would come through the lobby, go up the stairs, and they would be in the South bleachers. That area is accessible to the bathrooms and the lobby and the cafeteria without going across the floor. The North bleachers, where the Dubons chose to sit, and their testimony was that they chose to sit there because Tom Dubon wanted a better look at the horses so that he could bid on them. The question in the exclusion is whether from Waverly Sale Companies perspective, the area she was in was designated for non-participants. Waverly Sales... Could I have sat in the North bleachers? Excuse me? Could I have sat, suppose I'm just driving through town, could I have sat in the North bleachers? You would have had to cross the arena floor to do so and it would have been... To sit in the North bleachers. Right. You cannot get to the North bleachers without crossing the arena floor. The evidence regarding Waverly Sales Companies intentions, what they designated or intended, was that there was a piece in the catalog that the bidders get that you can pick up either at the sale barn or it's actually sent to people who have purchased and sold there before. It says seats will go on sale and it gives the date and the time. It's actually on the Wednesday before the actual horse sale starts from 9 to 1. Selling in the sale arena, there will be these are the seats that we're talking about that Dubon's chose to sit in. This is done to enable buyers to be closer to the animals in the sale ring. Ron Dean testified that they didn't want the buyers to have to kind of go around spectators. The idea of selling the reserve seats and most of these are the ringside seats, the ones that the Dubon's were sitting in, were so that the North bleachers is a place where, from the Waverly Sale Barn's perspective, was intended that non-participants be. Let me ask you the question, does this matter, does this court have jurisdiction to consider, to rule on this issue that was determined on summary judgment? Yes, your honor, and I was very surprised by that position in the appellant's, in the appellee's brief. Anytime the court has a rule of law on a summary judgment issue, after the ruling I asked that to be allowed to file an interlocutory appeal and the court denied that, the trial court denied my motion. Therefore, my only redress, the only way I could appeal that issue, was to appeal after final verdict in this case. Summary judgments are typically, are always appealable and it's a matter of when. Now to preserve the record, at the trial court level, I not only moved for verdict on the issue of the immunity, both after the plaintiff's case and at the close of evidence, I also submitted evidence outside the presence of the jury on the immunity statute itself. I had Ron Dean testify as to the signs that he had posted around his sale barn that were pursuant to chapter 673.3, which requires that the sponsor post signs and I had that put in. It was apparent that while the court was determining the legal issue, the immunity, the jury was in charge of the comparative fault issue. So that issue was still appealable on this, both the summary judgment and on the directed verdict. If there aren't any questions, I see that my time is up. Very well, the case is submitted. We will take it under consideration. Thank